Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | | |
|---|---|---|
| YANIRA GONZALEZ *(PRO SE)* | ) ) ) | Case No. _____ |
| | ) | *(to be filled in by the Clerk's Office)* |
| _____ | ) | |
| *Plaintiff(s)* | ) | Jury Trial: *(check one)* ☑ Yes ☐ No |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) ) ) ) | |
| -v- | ) | |
| President and Fellows of Harvard College | ) ) ) | |
| _____ | ) ) ) | |
| *Defendant(s)* | ) ) | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) ) | |

## COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | YANIRA GONZALEZ |
| Street Address | 2585 BROADWAY APT 116 |
| City and County | NEW YORK |
| State and Zip Code | NEW YORK |
| Telephone Number | 305 793 6408 |
| E-mail Address | PEOPLECOMMUNITYWORLD@GMAIL.COM |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

Defendant No. 1

|  |  |
|---|---|
| Name | President and Fellows of Harvard College |
| Job or Title *(if known)* |  |
| Street Address | 1033 Massachusetts Ave, Cambridge, MA 02138 |
| City and County | Cambridge |
| State and Zip Code | MA 02138 |
| Telephone Number | 617-495-1215 |
| E-mail Address *(if known)* | amanda_broderick@harvard.edu |

Defendant No. 2

|  |  |
|---|---|
| Name |  |
| Job or Title *(if known)* |  |
| Street Address |  |
| City and County |  |
| State and Zip Code |  |
| Telephone Number |  |
| E-mail Address *(if known)* |  |

Defendant No. 3

|  |  |
|---|---|
| Name |  |
| Job or Title *(if known)* |  |
| Street Address |  |
| City and County |  |
| State and Zip Code |  |
| Telephone Number |  |
| E-mail Address *(if known)* |  |

Defendant No. 4

|  |  |
|---|---|
| Name |  |
| Job or Title *(if known)* |  |
| Street Address |  |
| City and County |  |
| State and Zip Code |  |
| Telephone Number |  |
| E-mail Address *(if known)* |  |

**II.    Basis for Jurisdiction**

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question            ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.
Title VII of the Civil Rights Act of 1964
Age Discrimination in Employment Act of 1967 (ADEA) Title I of the Americans with Disabilities Act of 1990 (ADA) Civil Rights Act of 1991
Federal Family and Medical Leave Act (FMLA)

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* YANIRA GONZALEZ _____, is a citizen of the State of *(name)* NEW YORK _____.

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,

and has its principal place of business in the State of *(name)* _____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

b.    If the defendant is a corporation

The defendant, *(name)*  President and Fellows of Harvard Colleg , is incorporated under

the laws of the State of *(name)*    Massachusetts                                    , and has its

principal place of business in the State of *(name)*    Massachusetts                          .

Or is incorporated under the laws of *(foreign nation)*                                        ,

and has its principal place of business in *(name)*    1350 Massachusetts Avenue, Cambri .

*(If more than one defendant is named in the complaint, attach an additional page providing the
same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at
stake-is more than $75,000, not counting interest and costs of court, because *(explain)*:

Yearly salary (March 20, 2023, to March 20, 2025): $480,000.32
Earnings up to July 12, 2023: $78,468.46
Remaining earnings from July 12, 2023, to March 20, 2025: $401,531.86
Total Unpaid Wages $401,531.86

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the
facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was
involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including
the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and
write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

SHORT STATEMENTS OF THE CLAIM (ADDITIONAL 14 PAGES ATTACHED)
Title VII of the Civil Rights Act of 1964
Age Discrimination in Employment Act of 1967 (ADEA)
Title I of the Americans with Disabilities Act of 1990 (ADA)
Civil Rights Act of 1991
Federal Family and Medical Leave Act (FMLA)

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

Yearly salary (March 20, 2023, to March 20, 2025): $480,000.32
Earnings up to July 12, 2023: $78,468.46
Remaining earnings from July 12, 2023, to March 20, 2025: $401,531.86
Total Unpaid Wages $401,531.86

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

Additional Parts of Compensation Package
Liquidated Damages for Unemployment $25,000.00
Unemployment Period without Benefits $15,000.00
Retroactive Medical Coverage $15,000.00
Short-Term Disability Coverage $4,500.00
Continuing Education Support (PHD Allowance) $35,000.00
Retroactive Pension Plan Savings $8,000.00
Retroactive Matching Allowance for Retirement To be calculated based on specific terms $0.00

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        04/10/2025

Signature of Plaintiff

Printed Name of Plaintiff      YANIRA GONZALEZ

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

**Additional Pages for Initial Complaint**

I. **The Amount in Controversy**
   A. Unpaid Wages Due to Breach of Employment Contract
   B. Role: Senior IT Project Manager – 60927BR, Grade 58 (Exempt)
   C. Contract Term: March 20, 2023 – March 20, 2025 (possibility of reappointment)
   D. Salary:
      o Bi-weekly rate: $4,615.38
      o Annual equivalent: $120,000
      o One-time sign-on bonus: $2,000 (gross)
   E. Termination Date: July 12, 2023
   F. Total Amount Contested: $401,531.86
   G. Breakdown of Compensation
   H. Total Salary for Expected Contract Period: $480,000.32
   I. Earnings until Termination (March 20 – July 12, 2023): $78,468.46
   J. Unpaid Salary (July 12, 2023 – March 20, 2025): **$401,531.86**

II. **Additional Damages Due to Breach of Employment Contract**
   A. Beyond unpaid wages, additional components of the compensation package have been affected:
   B. Compensation Package Breakdown
      1. Liquidated Damages for Unemployment: $25,000.00
      2. Unemployment Period without Benefits: $15,000.00
      3. Retroactive Medical Coverage: $15,000.00
      4. Short-Term Disability Coverage: $4,500.00
      5. Continuing Education Support (PhD Allowance): $35,000.00
      6. Retroactive Pension Plan Savings: $8,000.00
      7. Retroactive Matching Allowance for Retirement: $0.00 (To be calculated)
      8. Eligibility for Administrative Fellowship Program (AFP): $60,000.00
   C. Total Additional Compensation Claimed: **$162,500.00**

U.S. DISTRICT COURT
DISTRICT MASS.
2025 APR 14  PM 12: 39
FILED
IN CLERKS OFFICE

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

### III. Exceptions to At-Will Employment Rules In Massachusetts

Although Massachusetts is an at-will employment state, the following exceptions apply

#### A. Illegal Reasons for Termination

1. Employers cannot terminate employees for discriminatory or retaliatory reasons.
2. *Case Reference:* Gonzalez vs. President and Fellows of Harvard College
3. Basis for EEOC Claim:

   a) Workplace discrimination and harassment (Afro-Caribbean hair accessory, demand for makeup, request for accommodation)
   b) Post-Termination Retaliation:
   c) Delay of approval for unemployment benefits
   d) Delay in employment verification using agreed Harvard Business School reference for a new job

#### B. Implied Contract Exception

1. Even in at-will states, an implied contract may exist through employer actions.
2. *Case Reference:* Gonzalez vs.President and Fellows of Harvard College
3. Reasoning:

   a) Signed employment agreement had a start and end date (March 20, 2023 – March 20, 2025)
   b) No clause indicating at-will employment
   c) Reasonable assumption that employment was contractual

#### C. Public Policy Exception

1. Employers cannot terminate an employee for exercising a legal right or refusing illegal actions.
2. *Case Reference:* Gonzalez vs. President and Fellows of Harvard College
3. Application:

   a) Exercised First Amendment right by supporting the Supreme Court decision against Harvard
   b) Expressed concerns via email regarding discriminatory and harassing practices at Harvard Business School
   c) Terminated and retaliated against as a result

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

---

## IV.    Summary of Total Compensation Claimed

| Category | Amount |
|---|---|
| Unpaid Wages | $401,531.86 |
| Additional Compensation Package | $162,500.00 |
| **Total Amount Contested** | **$564,031.86** |

## V.    Short Statements of the Claim
### A. Title VII of the Civil Rights Act of 1964

Plaintiff alleges racial and national origin discrimination by the defendant in violation of Title VII of the Civil Rights Act of 1964. As an Amerindian and African Caribbean woman, plaintiff asserts that the defendant engaged in discriminatory employment practices, including disparate treatment, denial of advancement opportunities, and fostering a hostile work environment. Plaintiff seeks compensatory damages for emotional distress, punitive damages, and other relief as deemed appropriate by the court.

**Examples:**

Harvard's failure to address the prohibition on hair accessories and offensive remarks was evident throughout my tenure. There was also a significant failure to uphold equal employment practices. During the 30-day discussion period, the discrimination I raised was inadequately addressed. Despite my requests for a report, constructive feedback, or a remediation plan, HR and Brenda Fannin provided none.

It was only after filing a Freedom of Information Act (FOIA) request for my EEOC file that I discovered a letter titled "Yanira Gonzalez 30 Day Red Flag," authored by Brenda Fannin on April 23, 2023. This letter not only validated offensive remarks but also failed to document Brenda Fannin's statement: "I knew you were not going to make it at Harvard, I knew you were not fit." This statement contributed to a hostile environment from the outset.

It is reasonable to conclude that if the contents of this letter were never discussed with me between April 23rd and July 12, 2023, they were created after the complaint was made regarding Brenda Fannin's discriminatory behavior. This could have been an effort to establish a precedent and possible

3

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

justification for future discriminatory actions, decisions, and outcomes against me.

Furthermore, Harvard misrepresented facts and intentionally delayed my unemployment benefits. The statement provided to the Department of Unemployment attempted to shift the narrative, portraying me as unable to meet satisfaction regarding the quality and quantity of work produced. This portrayal contradicts the circumstances surrounding my termination.

The approval process for my unemployment benefits took five weeks longer than expected due to the initial denial of my claim based on the wrong and misrepresented situation of "failure to meet expectations of the job." This delay further compounded the difficulties I faced after leaving Harvard.

### B. Age Discrimination in Employment Act of 1967 (ADEA)

Plaintiff alleges age discrimination in violation of ADEA. At 53 years old, plaintiff asserts wrongful termination, changes to her orientation and review period, dismissal of discrimination complaints, and manipulation of reporting structures instead of addressing bias. Additionally, the plaintiff was mocked for "technical challenges" and "mobility issues" when requesting accommodations for long-distance walking between buildings. Plaintiff was told she "would not fit in," despite being selected by a Harvard Business School panel and endorsed by an HR veteran. Plaintiff seeks reinstatement, lost wages, compensatory damages for emotional distress, punitive damages, and other relief as determined by the court.

### C. Title I of the Americans with Disabilities Act of 1990 (ADA)

Plaintiff alleges disability discrimination under ADA, citing a learning disability, dyslexia, and mental health conditions. Defendant dismissed and mocked plaintiff's request for reasonable accommodations, including preparation agendas for meetings. A manager responded, "I didn't know you had a disability," despite the plaintiff's prior disclosure in a company-wide meeting. Plaintiff seeks reasonable accommodations, compensatory damages for emotional distress, punitive damages, and other relief as determined by the court.

Example:

4

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

Harvard failed to support my request for accommodation by neglecting to provide an agenda in preparation for meetings. During one particularly distressing instance, I endured 37 minutes of contentious conversation with a disruptive, abusive, and discriminatory manager. This manager attempted to undermine and humiliate me while I was already in a vulnerable position.

### D. Civil Rights Act of 1991

Plaintiff alleges racial discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. As an Amerindian and African Caribbean employee, plaintiff asserts that the defendant denied a proper orientation and review period, failed to support discrimination complaints, and made disparaging remarks. Plaintiff was treated differently for wearing hair accessories, limiting makeup, and asserting her cultural identity while demonstrating technical expertise within Harvard University. Plaintiff seeks reinstatement, compensatory damages for emotional distress, punitive damages, and other equitable relief as determined by the court.

**Example:**

Harvard retaliated against me after I exercised my right to express myself in defense of justice and denounced discriminatory practices to a broader audience. I brought attention to their internal flaws, inefficiencies, and systemic failures that needed immediate action before pursuing a legal defense in light of the Supreme Court decision.

### E. Federal Family and Medical Leave Act (FMLA)

Plaintiff alleges violation of FMLA due to wrongful termination and denial of medical insurance benefits. Despite being eligible for leave and providing medical documentation, plaintiff's employer terminated her employment and revoked health coverage, violating regulations that protect employees during medical crises. Plaintiff seeks reinstatement, compensation for lost wages and medical expenses, punitive damages, and other relief as deemed just by the court.

**Example:**

Harvard denied my access to medical coverage at a critical time when it was medically necessary for my health. Typically, others retain their insurance and become eligible for Cobra shortly after termination. However, Harvard terminated me and removed my eligibility for short-term disability benefits precisely during this crucial period.

5

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

> Despite being aware of the situation, Harvard failed to provide the necessary safeguards, support for employee health, and work-life balance. This lack of support exacerbated the challenges I faced during a time of medical necessity.

## VI. Summary of Damages
### A. Unpaid Wages and Compensation
1. Unpaid Wages: $401,531.86
2. Liquidated Damages for Unemployment: $25,000.00
3. Unemployment Period Without Benefits: $15,000.00
4. Retroactive Medical Coverage: $15,000.00
5. Short-Term Disability Coverage: $4,500.00
6. Continuing Education Support (PhD Allowance): $35,000.00
7. Retroactive Pension Plan Savings: $8,000.00
8. Retroactive Matching Allowance for Retirement: To be calculated
9. Eligibility for Administrative Fellowship Program (AFP): $60,000.00

**Total Estimated Compensation Package: $564,031.86**

6

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

## VII.    Additional Validation and Historical Considerations

Plaintiff proposes additional AI-generated estimates factoring in historical labor
inequities. These calculations contextualize unpaid labor contributions from ancestral
forced migration and Harvard University's foundational reliance on enslaved workers
since 1636.

### AI-Based Compensation Estimate Model

**Assumption:** Each year of life is valued at 525,600 units (equivalent to $1 per
minute).

### Timeline 1 – Historical Ancestry Perspective

- Estimated lifespan per enslaved individual: **35 years**
- Unpaid wages estimated at **$50,000 per year**
- **Total compensation over 35 years: $1,750,000**

### Timeline 2 – Plaintiff's Lifetime Perspective

- Plaintiff's current age: **53 years**
- Unpaid wages estimated at **$50,000 per year**
- **Total compensation over 53 years: $2,650,000**

These estimates serve to highlight systemic labor inequities and historic economic
disparities. For the purposes of this case, plaintiff supports the streamlined
consideration of one category to ensure an expedited resolution.

7

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

**PERSONAL JOURNEY**

**VIII.    Background and Personal Journey: Mi Abuela's Mother**

This case of employment discrimination is deeply connected to the forced migration of my ancestors. By sharing these personal anecdotes, I aim to illustrate the lasting struggles for equality, respect, and dignity—past and present. These experiences have profoundly shaped my perspective on justice and fairness in the workplace.

### A.   Historical Context: Forced Migration and Ancestral Struggles

The migration of the Arawak people from the Amazon Basin to the Caribbean islands represents a pivotal chapter in indigenous history. Around 500 CE, Arawak-speaking groups expanded northward and eastward, settling in regions like Ayiti, Kiskeya, Quiskeya,where they established vibrant chiefdoms and agricultural societies. My ancestors belonged to the **Maguana Chiefdom**, specifically Bocas de Los Arroyos, Yaguate—known as *"the hill of rocks."*

The Taíno, a subgroup of Arawak-speaking peoples, flourished in complex chiefdoms until 1492, when Christopher Columbus arrived. His landing marked the beginning of systematic violence, enslavement, and genocide against my ancestors, erasing generations of cultural identity and autonomy.

European monarchs fueled this devastation:

- **Queen Isabella I & King Ferdinand II of Spain** sponsored Columbus's voyages, enabling mass displacement and brutal colonization.

- **King John II of Portugal** financed African coastal explorations and later backed Vasco da Gama's navigation to India.

- **King Charles I of Spain** empowered conquistadors like Hernán Cortés (Aztec destruction) and Francisco Pizarro (Inca conquest).

8

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

- **King Manuel I of Portugal** supported additional colonial expansion into Brazil.

- **King Francis I of France** sponsored North American expeditions, further entrenching European imperialism.

- **The Vatican,** a silent yet powerful orchestrator of influence.

These global patterns of exploitation paved the way for institutions—including Harvard University—to amass wealth and power while historically excluding indigenous voices from their foundations.

IX.   **Historical Context: Forced Migration and Ancestral Struggles.**

### A. Personal Ancestry: A Lineage of Survival

Despite centuries of displacement and erasure, my ancestors persisted. **Dionisia, my abuela's grandmother, was born in 1825 in Bocas de Los Arroyos, Yaguate.** This name, rich in Arawak and Taíno linguistic history, means *"the hill of stones"* and *"mouth of the rivers,"* reflecting the land's enduring spirit.

She passed her resilience to **Ramona, Ana, and Marina**—three generations of women who, like me, carried the legacy of survival and resistance. Born in 1971, I carry forward their struggles, shaped by the same cultural identity that once thrived before colonial destruction.

As a child, my environment mirrored my ancestors' deep connection to nature. Frogs, cocuyos (fireflies), and lizards filled my surroundings, affirming a lived experience that ties my personal journey to the empirical history of indigenous existence.

### B. Ancestral Pain and the Present Battle for Justice

The termination of my employment at Harvard University reignited historical injustices—echoing the systemic exclusion that has persisted for centuries. My dismissal was not merely a professional setback; it was an act of disregard for my ethnic, racial, and cultural identity.

My freedom of speech—a right granted by a Constitution built upon land stolen from indigenous communities—was used against me when I sought to assert my perspective within the workplace. My bloodline spans across cardinal points, tracing its roots from the Tequesta in the south to the Hopi in the west—and many more I am yet to reconnect with.

9

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

This case stands not only as a personal fight for fairness but as a testament to the ongoing struggle for indigenous and marginalized communities seeking rightful recognition in systems that historically excluded them.

### C. Impact on Identity

Forced migration shaped the identity and values of my family across generations, instilling resilience, determination, and a deep connection to the land. That legacy of survival continues today, manifesting in efforts to protect forests, the environment, and sacred spaces that hold ancestral significance.

### D. A Legacy of Migration and Cultural Identity

My great-grandmother was born in 1842—technically within Gran Colombia—during a time when the population was a mix of *criollos, mestizos, cholos,* and *mulatos.* While all these people shared Haitian roots, political geography shifted drastically in 1844 due to yet another territorial conflict driven by the same forces that had once terrorized our ancestors.

For generations, my family thrived on beautiful land in **Bocas de Los Arroyos**, a place where nature and tradition intertwined. We lived sustainably, cultivating a small farm with a choza for cooking and storage, firing up a mud oven with charcoal to make cassava and arepas. Our home was a hub for honoring the dead with *los montados,* where community and history merged in sacred farewells.

The land provided everything—zapote, mamey, níspero, hobos, limoncillos, and charanpolas. We grew plantains, yuca, batata, ñame, and nurtured molondrón and pan de fruta. We had cows, goats, chickens, pigs, a donkey, and a horse—reserved only for special occasions. It was paradise, untouched by the greed of external forces.

### E. Harvard's Investment and the Erosion of Indigenous Wealth

However, in 1899, Harvard University entered the scene through **the Consorcio Azucarero Italiano de La República Dominicana** (*Italian Sugar Consortium of the Dominican Republic / Ingenio CAEI*), financially backing sugar production operations in the region. The consortium, led by Italian investors, controlled vast sugar plantations, disrupting local land ownership and economic structures.

Harvard's involvement in sugar investments had profound and lasting consequences for my family—particularly my **abuela, Ana Aquino Guzman.** The university's financial stake reshaped land distribution, labor policies, and social dynamics in ways that marginalized indigenous and Afro-Caribbean communities. While we retained some of our land, Harvard's economic

10

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-PRO SE

influence set forth waves of dispossession that would impact generations to come.

### F. Further Exploitation: Cement Extraction and Corporate Expansion

Land disruptions did not stop with sugar production. The surrounding areas of our ancestral home fell under the control of yet another corporation—Cementos Argos. This cement factory, part of the powerful Santo Domingo Family conglomerate, extracted the very rocks that defined our landscape, stripping away the physical essence of Bocas de Los Arroyos.

This family maintained direct ties to European nobility, including the House of Grimaldi, Wellesley, and the House of Hohenzollern, embedding their influence into industries that profited from our stolen land. They even branded a cement product "Yaguate," produced from the rocks that once belonged to us, their extraction symbolizing a deeper historical erasure.

As a child, I was unaware of this geopolitical and financial entanglement—but the effects were palpable. Stories of struggle, discrimination, forced migration, unpaid labor, financial manipulation, and systemic barriers to education were passed down, shaping my understanding of the world.

### G. Personal Forced Migration and Harvard's Role in My Story

By 1990, it was my turn. A forced migration to New York—another chapter in the generational displacement my ancestors endured. Harvard University had a direct hand in this part of my life as well. My voice, rooted in the truth of Yaguate and its original people, was silenced when I defended our history, our ties to Haiti, my beautiful hair, and my unapologetic blackness.

That defiance led to expulsion, severing my connection to institutional education while reinforcing the same oppressive cycles that had displaced my ancestors for centuries. Yet, just as those before me resisted, I carry forth their fight for recognition, justice, and the reclamation of identity that Harvard and other powerful institutions have long sought to suppress.

### H. Parallel Experiences, Legal, and Social Justice

This case of employment discrimination mirrors the struggles my ancestors faced in their homeland, highlighting the persistent themes of injustice, inequality, and the fight for respect.

One historical event that deeply resonates with my frustration and anger is the Wounded Knee Massacre on December 29, 1890, at Wounded Knee Creek on the Lakota Pine Ridge Indian Reservation in South Dakota. This tragic attack marked the violent culmination of tensions between the U.S.

11

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

government and Native American tribes—particularly the Lakota Sioux—ending the Indian Wars on the Great Plains and serving as a stark example of state-sponsored oppression.

## X.    Harvard's Role in 1890: Power, Wealth, and Institutional Silence

In the same year, Harvard University housed several prominent intellectual figures—leaders in theology, philosophy, economics, and law—all of whom shaped academic discourse but left no documented legacy of using their power to uplift the indigenous communities their institution impacted.

### Key Harvard Scholars in 1890

- **Francis Greenwood Peabody (Theology)** – Professor of Christian Morals at Harvard Divinity School, shaping liberal Protestant theology and social ethics.

- **William James (Philosophy)** – Pioneer of American psychology, influential in pragmatism and philosophy of the mind.

- **William Z. Ripley (Economics)** – Economist and sociologist studying industrial organization and race relations.

- **James Barr Ames (Law)** – Dean of Harvard Law School and contributor to modern case law methods.

Their writings shaped generations of scholars, but history lacks evidence of their practical efforts to address systemic injustice or support indigenous communities. Harvard's financial and intellectual legacy continued to expand, yet the suffering of the people affected by its institutional wealth remained unaddressed.

## XI.    The Global Interconnection of Indigenous Struggles

The original people of every tectonic plate were once bound together on a single landmass. My pain is the same pain felt by Brazil, Guatemala, Jamaica, Kenya, Burkina Faso, Ethiopia, Angola, Samoa, and the Philippines. We share histories of displacement, exploitation, and stolen wealth.

My case is more than personal—it is a plea for overdue justice, a reclamation of stolen dignity.

### A.  Forced Migration: The Struggle for Validation

1. I was forced to migrate. To beg for a visa. To **prove my worth** and my "potential for good."

12

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

2. I worked **fives times as hard for access to education.**

3. I accumulated **eight  times the debt** just to be eligible for the same opportunities as others.

4. I waited **ten times longer to move up the career ladder**, knowing my skills, attitude and creativity were as strong—if not stronger—than those who advanced before me.

When I mesmerized an eight-person panel to validate my credentials for the Sr. Project Manager position, I had no doubts about my ability—I didn't need validation. I knew my craft, my skills, my expertise. Yet the system demanded a greater burden from me, while those who once terrorized my ancestors built legacies of wealth, power, and legal control over education.

## XII.    Historic and Ongoing Abuses

The oppression I have faced mirrors past injustices:

- 1887 Dawes Act – The forced allotment of indigenous lands, breaking communal ties and sovereignty.

- 1890 Wounded Knee Massacre – A terrorist act against Native Americans exercising their right to culture, love, and respect for the land.

- The Rockefeller Foundation has been exploiting Brazil since 1910.

- 1913 Land Appropriation in South Africa: The Natives Land Act restricts black South Africans from owning land outside of specific reserves, exacerbating land inequality and dispossession.

- Late 19th to mid-20th century Guatemala - United Fruit Company: Significant land concessions lead to conflicts over land rights, labor conditions, and political influence.

- 1952-1960 Mau Mau Uprising in Kenya: Kikuyu people resist British colonial land policies and dispossession.

- 1971 Alaska Native Claims Settlement Act: A delayed response to land dispossession.

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

- Late 20th century Honduras - United Fruit Company and Agrarian Reforms: United Fruit Company leads to land disputes and subsequent agrarian reforms.

- 1980s Land Issues in Zimbabwe: Government redistributes land from white farmers to black Zimbabweans, causing political and economic tensions.

- Ogoni Land and Shell Oil in Nigeria: Ogoni people protest against Shell Oil for environmental degradation and unfair resource exploitation in the Niger Delta.Shell Oil, along with other multinational oil companies, has been active in the Niger Delta since the 1950s.

- 1993 Nunavut Land Claims Agreement (Canada): Indigenous communities wait decades for rightful recognition.

- 1964-1985 Military Dictatorship in Brazil: During this period, land grabbing, exploitation of natural resources, and displacement of indigenous peoples intensified.

- 2019-present Amazon Rainforest Deforestation: Rampant deforestation and land grabbing threaten indigenous territories and biodiversity in the Amazon rainforest.

- Italian Settlements in Watamu: Since the early 20th century, Italians have been involved in establishing settlements and acquiring land in Watamu, a coastal town in Kenya.

## XIII.  Conclusion: A Case Beyond Employment

This case is not just about a job. It is about historical accountability, a confrontation with entrenched systems of oppression, and a long-overdue demand for justice—not just for me, but for every displaced and marginalized people throughout history.

### A.  Punitive Damages and Reparations

My recovery, reparations, and damages are long overdue—now in 2025. Harvard has a financial, social, linguistic, intellectual, academic, philosophical, and spiritual obligation to the original people of our planet's tectonic plates. In this case, I speak on behalf of all those affected, demanding that the proceeds be allocated to address three main issues that are essential for justice and equity.

#### 1.  Issue 1: Return of Land to the Original Guardians of the Earth

14

Land must be returned to "los verdaderos"—the rightful protectors and guardians of the planet. The historical system that exploited indigenous land and labor was meticulously documented, particularly through the sugar plantation tabulation system.

A highly regulated industry, sugar plantations assigned monetary value to everything—from enslaved laborers to livestock. Every acre was accounted for, reinforcing a deeply entrenched economic model that enabled institutions like Harvard, Cambridge, and Oxford to profit off displacement and oppression. As James Walvin explains in *How Sugar Corrupted the World*, doubts about slavery only emerged in the mid-to-late 18th century—long after the system had been firmly established.

A similar tabulation method should be employed to calculate and facilitate land restitution. Harvard must acknowledge its role and lead efforts in returning land to indigenous communities.

## 2. Issue 2: Clean Water Accessibility for All

Access to clean water is a fundamental human right that must be prioritized.

Estimated cost per person per day: $1.63

Annual cost: $595.95

Total cost over a 53-year lifespan: $30,989.40

This amount is equivalent to the cost of a single Harvard student's suit—a stark reminder of the economic disparities that persist. Technology-driven solutions such as simulations, hackathons, and nonprofit initiatives can solve this issue within nine months.

To illustrate feasibility:

- Amazon Web Services' average product launch timeline: 6 months to 1 year
- UK Amazon Publishing process: 6 months to 1 year

If corporations can move at this pace for profit-driven projects, a global clean water initiative should be implemented with similar urgency.

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

### 3. Issue 3: Eliminating Slums Created by Forced Migration

Forced migration, exploitation, and economic disparity have created slums worldwide. These must be systematically eliminated through real estate returns, structural planning, and sustainable economic reinvestment.

Estimated timeline for resolution: 525 days

- Manhattan Project timeline: ~2 years
- Combined square footage of Rockefeller Center + The Cloisters: 4,483,000 sq. ft.

Housing Feasibility Calculation

Using standard residential space guidelines:

- 500 sq. ft. per person: ~8,966 people housed
- 800 sq. ft. per person: ~5,603 people housed

Through urban reinvestment and reclamation of stolen land, displaced communities can be restored and provided dignified living conditions.

### XIV.   Harvard's Role: A Legacy of Colonial Influence

The dissolution of Gran Colombia was influenced by European powers seeking economic control through debt diplomacy, free trade economics, and financial leverage. Britain's banks profited from Gran Colombia's weaknesses, exacerbating regional instability and ensuring dominance over land and resources.

Harvard stands today as a direct representation of British influence—a continuation of colonial control over regions like Yaguate, San Cristóbal, and countless others. As a descendant of indigenous and Afro-Caribbean slaves, I have lived the generational consequences of this institutional power. My wrongful termination—based on my hair, my warrior spirit, and my determination to stand for justice—is yet another manifestation of this historic oppression.

### XV.   Conclusion: A Call for Action

This case is not just about my personal damages—it is about confronting deep-seated systemic injustices perpetuated by institutions like Harvard. Land, water, and dignity must be restored to the original stewards of our

16

Gonzalez vs President and Fellows of Harvard College
Yanira Gonzalez-**PRO SE**

planet, and the mechanisms used to exploit indigenous people must now be used to repair and return what was taken.

Harvard's financial and ideological influence must be redirected toward global restitution, ensuring that justice is not merely spoken but acted upon.

This can start with my case.

17